BENJAMIN DEAN & another *vs.* AMERICAN MUTUAL LIFE INSURANCE COMPANY.

Suicide committed by a person who understood the nature of the act, and intended to take his own life, though committed during insanity, avoids a policy of life insurance, which provides that it shall be void, if the assured shall die by his own hand.

CONTRACT by the administrators of Jonathan H. Cheney, upon a policy of life insurance by which the defendants insured his life in the sum of $5000. The policy contained the following proviso : " And it is further provided, and this policy is granted and accepted upon the express terms and conditions that, if the said J. H. Cheney shall die by his own hand, or in consequence of a duel, or by the hands of justice, or in the known violation of any state, national or provincial law, the same shall be null, void and of no effect."

The parties agreed, in this court, that Cheney did cause his own death, by cutting his throat with a razor. The plaintiffs, however, alleged and offered to prove that the act whereby his death was caused was the direct result of insanity, and that his insanity was what is called suicidal depression, impelling him to take his life, and that suicide is the necessary and direct result of such insanity or disease.

The chief justice reserved the case for the determination of the whole court.

*J. G. Abbott & B. Dean,* for the plaintiffs. 1. The whole object of taking the policy was, to provide for a pecuniary payment in case of death by disease or accident. The proviso was intended to meet the case of a voluntary self-destruction by a reasonable being. Its object was to bring the fact distinctly to the attention of the assured, that if he should take his life voluntarily, while in possession of his reason, his representatives would lose the benefit of the policy. 2. The disease of insanity was as much the cause of Cheney's death, as disease in a case of fever It is not correct to say that death was caused by his hand. The cause of death was disease. Under the construction contended for by the defendants, that intelligent will is not required, the policy would be void if his hand were guided by the superior force of another. In the present case, the will was overpowered by disease; in the case supposed, by superior force from without. In neither case is it his act. The rule would be the same, if in a fit of somnambulism he had thrown himself from a window, or met his death by the accidental discharge of a pistol in his own hands. The true meaning and construction of the proviso is this: the contract is made with an intelligent and reasonable being, who is responsible for his acts; and it cannot be avoided except by the act of the same reasonable and responsible being. 3. This appears also from the context. The other conditions of forfeiture depend on a criminal violation of law. 4. The point has been decided in favor of the plaintiffs in New York. *Breasted* v. *Farmers' Loan & Trust Co.* 4 Hill, (N. Y.) 74. In the English cases, where the contrary doctrine has been held, the opinions were not unanimous, and were strictly confined to the precise cases presented.

*C. B. Goodrich & H. A. Scudder,* for the defendants, cited, in addition to cases cited in the opinion, Addison on Con. 600; *Amicable Society* v. *Bolland,* 4 Bligh (N. S.) 194, and 2 Dow & Clark, 1; *Cook* v. *Black,* 1 Hare, 390; *Moore* v. *Woolsey,* 4 El. & Bl. 243; *Vyse* v. *Wakefield,* 6 M. & W. 442.

BIGELOW, C. J. There can be no doubt that the facts agreed by the parties concerning the mode in which the assured destroyed his own life bring this case within the strict letter of the

proviso in the policy, by which it was stipulated that it should be void and of no effect if the assured should " die by his own hand." The single question, therefore, which we have to determine is, whether, on the well settled principles applicable to the construction of contracts, we can so interpret the language of the policy as to add to the proviso words of qualification and limitation by which the natural import of the terms used by the parties to express their meaning will be so modified and restricted that the case will be taken out of the proviso, and the policy be held valid and binding on the defendants. In other words, the inquiry is, whether the proviso can be so read that the policy was to be void in case the assured should die by his own hand, he being sane when the suicide was committed. If these or equivalent words cannot be added to the proviso, or if it cannot be held that they are necessarily implied, then it must follow that the language used is to have its legitimate and ordinary signification, by which it is clear that the policy is void.

In considering this question, we are relieved of one difficulty which has embarrassed the discussion of the same subject in other cases. If the proviso had excepted from the policy death by " suicide," it would have been open to the plaintiffs to contend that this word was to have a strict technical definition, as meaning in a legal sense an act of criminal self-destruction, to which is necessarily attached the moral responsibility of taking one's life voluntarily, and in the full exercise of sound reason and discretion. But the language of the proviso is not necessarily limited by the mere force of its terms. The words used are of the most comprehensive character, and are sufficiently broad to include every act of self-destruction, however caused, without regard to the moral condition of the mind of the assured, or his legal responsibility for his acts.

Applying, then, the first and leading rule by which the construction of contracts is regulated and governed, we are to inquire, what is a reasonable interpretation of this clause, according to the intent of the parties. It certainly is very difficult to maintain the proposition that, where parties reduce their contract to writing, and put their stipulations into clear and unambiguous

language, they intended to agree to anything different from that which is plainly expressed by the terms used. It is, however, to be assumed that every part of a contract is to be construed with reference to the subject matter to which it relates, and with such limitations and qualifications of general words and phrases as properly arise and grow out of the nature of the agreement in which they are found. Giving full force and effect to this rule of interpretation, we are unable to see that there is anything unreasonable or inconsistent with the general purpose which the parties had in view in making and accepting the policy, in a clause which excepts from the risks assumed thereby the death of the assured by his own hand, irrespective of the condition of his mind, as affecting his moral and legal responsibility at the time the act of self-destruction was consummated. Every insurer, in assuming a risk, imposes certain restrictions and conditions upon his liability. Nothing is more common than the insertion, in policies of insurance, of exceptions by which certain kinds or classes of hazards are taken out of the general risk, which the insurer is willing to incur. Especially is this true in regard to losses which may arise or grow out of an act of the party insured. Such exceptions are founded on the reasonable assumption that the hazard is increased when the insurance extends to the consequences which may flow from the acts of the person who is to receive a benefit to himself or confer one on others by the happening of a loss within the terms of the policy. Where a party procures a policy on his life, payable to his wife and children, he contemplates that, in the event of his death, the sum insured will enure directly to their benefit. So far as a desire to provide in that contingency for the welfare and comfort of those dependent on him can operate on his mind, he is open to the temptation of a motive to accelerate a claim for a loss under the policy by an act of self-destruction. Against an increase of the risk arising from such a cause, it is one of the objects of the proviso in question to protect the insurers. Although the assured can derive no pecuniary advantage to himself by hastening his own death, he may have a motive to take his own life, and thus to create a claim under the policy, in order to

confer a benefit on those who, in the event of his death, will be entitled to receive the sum insured on his life. Unless, then, we can say that such a motive cannot operate on a mind diseased, we cannot restrict the words of the proviso so as to except from the risk covered by the policy only the case of criminal suicide, where the assured was in a condition to be held legally and morally responsible for his acts. It certainly would be contrary to experience to affirm that an insane person cannot be influenced and governed in his actions by the ordinary motives which operate on the human mind. Doubtless there may be cases of delirium or raving madness where the body acts only from frenzy or blind impulse, as there are cases of idiocy or the decay of mental power, in which it acts only from the promptings of the lowest animal instincts. But, in the great majority of cases where reason has lost its legitimate control, and the power of exercising a sound and healthy volition is lost, the mind still retains sufficient power to supply motives and exert a direct and essential control over the actions. In such cases, the effect of the disease often is to give undue prominence to surrounding circumstances and events, and, by exaggerating their immediate effects or future consequences, to furnish incitement to acts of violence and folly. A person may be insane, entirely incapable of distinguishing between right and wrong, and without any just sense of moral responsibility, and yet retain sufficient powers of mind and reason to act with premeditation, to understand and contemplate the nature and consequences of his own conduct, and to intend the result which his acts are calculated to produce. Insanity does not necessarily operate to deprive its subjects of their hopes and fears, or the other mental emotions which agitate and influence the minds of persons in the full possession of their faculties. On the contrary, its effect often is to stimulate certain powers to extraordinary and unhealthy action, and thus to overwhelm and destroy the due influence and control of the reason and judgment. Take an illustration. A man may labor under the insane delusion that he is coming to want, and that those who look to him for support will be subjected to the ills of extreme poverty. The natural effect

of this species of insanity is to create great mental depression, under the influence of which the sufferer, with a view to avoid the evils and distress which he imagines to be impending over himself and those who are dependent upon him for support, is impelled to destroy his own life. In such a case, suicide is the wilful and voluntary act of a person who understands its nature, and intends by it to accomplish the result of self-destruction. He may have acted from an insane impulse, which prevented him from appreciating the moral consequences of suicide; but nevertheless he may have fully comprehended the physical effect of the means which he used to take his own life, and the consequences which might ensue to others from the suicidal act. It is against risks of this nature — the destruction of life by the voluntary and intentional act of the party assured — that the exception in the proviso is intended to protect the insurers. The moral responsibility for the act does not affect the nature of the hazard. The object is to guard against loss arising from a particular mode of death. The *causa causans*, the motive or influence which guided or controlled the will of the party in committing the act, are immaterial, as affecting the risk which the insurers intended to except from the policy. This view is entirely consistent with the nature of the contract. It is the ordinary case of an exception of a risk which would otherwise fall within the general terms of the policy. These comprehended death by disease, either of the body or brain, from whatever cause arising. The proviso exempts the insurers from liability when life is destroyed by the act of the party insured, although it may be distinctly traced as the result of a diseased mind. It may well be that insurers would be willing to assume the risk of the results flowing from all diseases of the body, producing death by the operation of physical causes, and yet deem it expedient to avoid the hazards of mental disorder, in its effects on the will of the assured, whether it originated in bodily disease or arose from external circumstances, or was produced by a want of moral and religious principle.

It was urged very strongly, by the learned counsel for the plaintiffs, that this view of the construction of the contract was

open to the fatal objection, that it would necessarily lead to the absurd conclusion, that death, occasioned by inevitable accident or overpowering force, or in a fit of delirium or frenzy, if the proximate and immediate cause was the hand of the person insured, would be excepted from the risks assumed by the defendants. But this objection is sufficiently answered by the obvious suggestion, that such an interpretation, although within the literal terms of the proviso, would be contrary to a reasonable intent, as derived from the subject matter of the contract. An argument having for its basis a *reductio ad absurdum* is not entitled to much weight, when it is necessary to ascertain the intention of the parties to a contract, and to conform to that intention in giving an interpretation to the language used. Indeed, when it becomes necessary, (as the case on the part of the plaintiffs requires,) to desert the literal import of terms adopted by parties to express their meaning, as it cannot be reasonably supposed that they intended to enter into stipulations which would be unreasonable or absurd, all conclusions which tend to establish such a result are necessarily excluded. The question in such cases is not, how far can the literal meaning of words be extended; but, what is a reasonable limitation and qualification of them, having regard to the nature of the contract and the objects intended to be accomplished by it. Applying this principle to the present proviso, and assuming that the plaintiffs are right in their position, that the words used are not to be interpreted literally, it would seem to be reasonable to hold that they were intended to except from the policy all cases of death caused by the voluntary act of the assured, when his deed of self-destruction was the result of intention, by a person knowing the nature and consequences of the act, although it may have been done under an insane delusion, which rendered the party morally and legally irresponsible, incapable of distinguishing between right and wrong, and which, by disturbing his reason and judgment, impelled him to its commission. If the suicide was an act of volition, however excited or impelled, it may in a just sense be said that he died by his own hand. But beyond this, it would not be reasonable to extend

the meaning of the proviso. If the death was caused by acci-
dent, by superior and overwhelming force, in the madness of
delirium, or under any combination of circumstances from which
it may be fairly inferred that the act of self-destruction was not
the result of the will or intention of the party adapting means
to the end, and contemplating the physical nature and effects
of the act, then it may be justly held to be a loss not excepted,
within the meaning of the proviso. A party cannot be said to
die by his own hand, in the sense in which those words are used
in the policy, whose self-destruction does not proceed from the
exercise of an act of volition, but is the result of a blind im-
pulse, of mistake or accident, or of other circumstances over
which the will can exercise no control.

In seeking to ascertain the intention of parties, some weight
is to be given to the practical results which would be likely to
follow from the adoption of a particular construction of the
words of a contract. It is reasonable to suppose that these
were in contemplation of the insurers, at the time the policy
was issued. Certainly it is fair to infer that they intended to
put some material limitations upon their liability by the inser-
tion of this proviso. But if it is to be construed as including
only cases of criminal self-destruction, it would rarely, if ever,
effect this object. Those familiar with the business of insurance
and with the results of actions on policies of insurance in courts
of law know how difficult it is to establish a case of exemption
from liability under an exception in a policy, where it depends
on a question of fact to be decided by the verdict of a jury.
If this is true in regard to ordinary claims under policies, it is
obvious that the difficulty would be greatly enhanced in cases like
the present, where it would be sufficient, in order to take a case
out of the operation of the proviso, to prove that self-destruction
was the result of insanity. It would not be hazardous to affirm
that, in all cases where such an issue was to be determined by a
jury between an insurance company and the representatives of
the deceased, the act of suicide would be taken as proof of
insanity. Such considerations were not likely to have escaped
the attention of practical men in framing this general proviso ;

and, in a doubtful case of construction, they are not to be over-looked in giving an interpretation to the words used by them.

The learned counsel for the plaintiffs have insisted with great force on an argument drawn from the context, to show that the proviso was intended to embrace only a case of criminal self-destruction by a reasonable and responsible being. But it seems to us that the maxim *noscitur a sociis*, on which they rely, does not aid the construction for which they contend. The material part of the clause is, that the policy is to be void if the assured " shall die by his own hand, or in consequence of a duel, or by the hands of justice, or in the known violation of any state, national or provincial law." Now the first and most obvious consideration suggested by other parts of this clause is, that in enumerating the causes of death which shall not be deemed to be within the risks covered by the policy, one of them is in terms made to depend on the existence of a criminal intention. It is a " known " violation of law, which is to avoid the policy. This tends very strongly to show that where an act producing death may be either innocent or criminal, if it is intended to except only such as involves a guilty intent, it is carefully so expressed in the proviso. The inference is very strong that, if they designed to confine the exception in question to cases of criminal suicide, it would have been so provided in explicit terms. So far, the argument drawn from the context does not support the plaintiffs' claim. Take then another of the causes of death, death in a duel, enumerated in the proviso. It seems to us to be a *petitio principii* to assume that death in conse-quence of a duel necessarily implies an act for which the party would be criminally responsible. Why is not this part of the proviso open to the same argument as that which is urged in regard to the clause relating to self-destruction ? A duel may be fought by a party acting under duress, or impelled thereto by an insane delusion, which might blind his moral perceptions and render him legally irresponsible. If so, then the same an-swer to a defence set up against a claim under the policy would be open under this clause, as the one now urged in behalf of the plaintiffs ; and the argument founded on the assumption that a

forfeiture under this part of the proviso necessarily involves a criminal violation of law, falls to the ground. Therefore the inference that a guilty intention is communicated from this branch of the proviso to that relating to death by the act of the assured seems to us to be unfounded. The only remaining clause is that which provides for the case of death by the hands of justice. This undoubtedly implies that the person insured has been found guilty of a criminal act by a judicial tribunal according to the established forms of law. But it is not correct to say that it necessarily involves the existence of a criminal intent, because it might be shown that the conviction of the assured was erroneous, and that he was in fact innocent of the crime for which he suffered the penalty of death. So far, therefore, as any argument can be justly drawn from the connection in which the words as to self-destruction stand in relation to other parts of the proviso, it leads to the conclusion that it was not solely death occasioned by acts of the assured involving criminal intent or a wilful violation of law by a person morally and legally responsible, which was intended to be excepted from the risks assumed by the insurers; but that, with the exception of death in a known violation of law, the proviso embraces all cases where life is taken in consequence of the causes specified, without regard to the question, whether at the time the assured was amenable for his act either *in foro conscientiæ* or in the tribunals of justice.

It may be added that a departure from the literal terms of a contract is always attended with great difficulty and danger, because it is apt to lead to great latitude of construction and to give uncertainty to the language which the parties have adopted to express their meaning. It certainly never should be extended beyond the clear intent of the parties, as derived from other parts of the agreement, or the subject matter to which the contract relates. This position may be illustrated by reference to another part of the policy declared on. The proviso which precedes that on which the present question has arisen contains a stipulation that the policy shall be void if the assured without the consent of the defendants in writing shall during certain portions of the

year visit the more southerly parts of the United States, or shall pass without the settled limits of the United States. If the assured in a fit of insanity should wander from his home and go within the prohibited territory, would the policy be void? If he was taken prisoner and went thither with his captors, would he lose his claims under the policy? These and similar questions, which might arise under other clauses of the policy, seem to show that it is more safe to adhere to the strict letter of the contract, and to hold parties to the salutary rule which requires them to express in clear and unambiguous terms any exceptions which they desire to engraft on the general words of a contract.

So far as the adjudicated cases bear on the question which we have considered in the present case, the weight of authority is against the claim of the plaintiffs under the policy. In the case of *Borrodaile* v. *Hunter*, 5 Man. & Gr. 639, where the policy contained a proviso very similar to that found in the policy declared on, it was held that the policy was avoided, as the proviso included all cases of voluntary self-destruction, and was not limited to acts of criminal suicide. From this opinion there was a dissent by the chief justice. In *Clift* v. *Schwabe*, 3 C. B. 437, a similar decision was made by the exchequer chamber, two of the judges dissenting. These cases seem now to be regarded as having settled the law in England in conformity with the opinion of the majority of the judges. *Dufaur* v. *Professional Life Ass. Co.* 25 Beav. 602. A different opinion was arrived at in *Breasted* v. *Farmers' Loan & Trust Co.* 4 Hill, (N. Y.) 74, and 4 Selden, 299, from which, however, several of the most learned justices of the court of appeals dissented.

In 1 Phil. Ins. § 895, it is stated that any mental derangement sufficient to exonerate a party from a contract would render a person incapable of occasioning the forfeiture of a policy under a clause like the one in question. In support of this proposition no authorities are cited except the cases above named of *Borrodaile* v. *Hunter* and *Breasted* v. *Farmers' Loan & Trust Co.* as reported in 4 Hill. If it is intended by it to assert that the principle, on which a contract made with an insane person is

held to be void as to him, applies to this clause so as to exclude from its operation all cases of self-destruction occasioned by insanity, it seems to us that the position is untenable. The reason for the rule which exempts a person from liability on a contract into which he entered when insane is, that he is not deemed to have been capable of giving an intelligent assent to its terms. But this rule is not applicable, where a contract is made with a person in the full possession of his faculties, and he subsequently, in a fit of insanity, commits a breach of it or incurs a penalty under it. He is then bound by it. His mind and will have assented to it. No subsequent mental incapacity will absolve him from his responsibility on it, unless from its nature it implies the continued possession of reason and judgment and the action of an intelligent will. A party may be liable on an unexecuted contract, after he has lost the use of his mental faculties, as he may be held responsible *civiliter* for his torts. *Bagster* v. *Portsmouth,* 7 D. & R. 614. *Weaver* v. *Ward,* Hob. 134. *Cross* v. *Andrews,* Cro. Eliz. 622. To say that insanity exonerates a party from a forfeiture under such a proviso in a policy, is to assume that this was the intention of the parties when the contract of insurance was entered into. But if such was not the intention, then it follows that the assured gave an intelligent assent to a contract, by which he stipulated that if he took his own life voluntarily, knowing the consequences of his act, he would thereby work a forfeiture of his claim under the policy, although he may have acted under the influence of insanity in committing the suicidal act. So that, after all, we are brought back to the inquiry, what was the intention of the parties to the contract, in order to ascertain the true construction of the proviso.

The result to which we have come, after a careful and deliberate consideration of the question, during which we have felt most sensibly the very great difficulties and embarrassments which surround the subject, is, that the plaintiffs are not entitled to recover. The facts agreed by the parties concerning the mode in which the plaintiffs' intestate took his own life leave no room for doubt, that self-destruction was intended by him,

he having sufficient capacity at the time to understand the
nature of the act which he was about to commit, and the con-
sequences which would result from it.   Such being the fact, it
is wholly immaterial to the present case that he was impelled
thereto by insanity, which impaired his sense of moral responsi-
bility, and rendered him to a certain extent irresponsible for his
actions.                                   *Plaintiffs' nonsuit.*