### HOME INSURANCE COMPANY *v.* AETNA LIFE AND CASUALTY COMPANY (12434)

DUPONT, C. J., and LAVERY and SCHALLER, Js.

Argued April 6—decision released June 8, 1994

*William F. Gallagher,* with whom, on the brief, were *Cynthia C. Bott* and *Roger B. Calistro,* for the appellant (plaintiff).

*Edward W. Case,* for the appellee (defendant).

*Lois B. Tanzer,* for Barry D. Schuss.

DUPONT, C. J. The plaintiff appeals from the summary judgment rendered by the trial court in favor of the defendant. This is a subrogation action to recover an amount paid by the plaintiff insurer for damages caused by a fire at the Emanuel Synagogue in West Hartford. The fire was set by Barry Schuss who pleaded

guilty to arson in the third degree in violation of General Statutes § 53a-113 (a). Schuss' parents are insured by the defendant.

The plaintiff, as the insurer and assignee of the Emanuel Synagogue, paid its insured $696,539.71 for the damage caused by the fire and commenced an action against Schuss to recover the amount paid. As a special defense, Schuss initially pleaded that he had been "exposed to various experiences in his personal life so as to result in a growing psychological vulnerability [and] . . . his loss of a substantial ability to control himself." Schuss later withdrew the special defense, and the court rendered judgment, in accordance with a stipulation, against Schuss for $696,539.71 plus interest. The plaintiff and Schuss stipulated that the plaintiff would seek to satisfy the judgment only to the extent that Schuss had insurance coverage.

The plaintiff then commenced a subrogation action against the defendant, the insurer of Schuss' parents, to recover the amount of the judgment obtained against Schuss. The defendant did not deny that Schuss qualified as an insured under a general liability policy it issued to Schuss' parents. The defendant, however, pleaded as a special defense that it had no obligation to pay the judgment because Schuss' conduct of August 15, 1983, fell within an exclusion of the policy's coverage. The exclusion provides that the insurer is not liable for property damage "which is expected or intended by the insured."

The plaintiff filed an application for order pursuant to General Statutes § 52-146f for the release of certain confidential psychiatric records of Schuss.[1] The plain-

---

[1] The plaintiff filed the application after Schuss refused to release his psychiatric records to the plaintiff voluntarily. The plaintiff sought access to the following records: (1) treatment at the Institute for Living between 1984 and 1989, where Marvin Koff was his main treating physician; (2) treat-

tiff claimed that the defendant's special defense made Schuss' mental condition an issue in the case. The trial court denied the plaintiff's application on the ground that the defendant, not Schuss, introduced Schuss' mental condition as an issue in the case. The court also concluded that under the principles of subrogation the plaintiff held the contractual rights of Schuss but not his personal rights such as the privilege of confidentiality.

After the denial of the plaintiff's application, the defendant filed a motion for summary judgment, claiming that Schuss' plea of guilty to arson in the third degree conclusively established that he intended to cause damage to the synagogue, which would prevent him from being covered by the insurance policy. After the trial court denied the motion, the defendant filed a second motion for summary judgment, contending that statements made by Schuss in a deposition of December 18, 1990,[2] indicated that he intended or

ment as an in-patient in December, 1983, at Yale-New Haven Hospital; and (3) treatment with psychiatrist Paul Graffagnino and a psychiatrist from Bethesda, Maryland, prior to August 15, 1983.

[2] During Schuss' deposition of December 18, 1990, Schuss admitted that when he entered the synagogue and when he started the fire, he expected and hoped to cause damage to the synagogue. Other depositions of Schuss did not contain statements contradicting these admissions. The following questions were asked and the following responses were elicited from Schuss during his deposition:

"Q. Okay, do you know the reason why you took matches [into the synagogue]?

"A. Yes.

"Q. And what is that reason?

"A. To cause damage to the synagogue.

* * *

"Q. And when you lit the match or matches to [objects in the synagogue] did you expect that you would cause damage to these objects?

"A. Yes.

* * *

"Q. What did you expect to do in the sanctuary [of the synagogue]?

expected to damage the synagogue, which allegedly would trigger the application of the policy exclusion. The trial court granted this motion for summary judgment on the ground that there was no evidence before the court "except that which indicates Schuss intended to start the fires and do damage." The plaintiff claims on appeal that the trial court improperly (1) denied the application for an order releasing Schuss' psychiatric records and (2) granted the motion for summary judgment.

I

The plaintiff claims that the trial court improperly denied the plaintiff access to the psychiatric records of Schuss. We agree.

Pursuant to General Statutes §§ 52-146d and 52-146e, psychiatric communications and records[3] regarding the treatment or diagnosis of a patient's

---

"A. I expected to cause a lot of damage.

\* \* \*

"Q. What were you thinking when you entered the synagogue in August of 1983?
"A. I was thinking to cause damage to the synagogue.
"Q. And is that all you were thinking?
"A. Yes.
"Q. Were you thinking that you were going to burn down the entire synagogue?
"A. Yes.
"Q. Were you thinking that you just wanted to damage some objects that were stored in the synagogue?
"A. I was hoping to burn down the synagogue."

[3] General Statutes § 52-146d (2) provides: " 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ."

mental condition are confidential and may not be disclosed without the consent of the patient or his authorized representative. General Statutes § 52-146f (5) contains an exception to the confidentiality statute, providing that "records may be disclosed in a civil proceeding in which the patient introduces his mental condition as an element of his claim or defense . . . and the court or the judge finds that it is more important to the interests of justice that the [records] be disclosed than that the relationship between patient and psychiatrist be protected."

The plaintiff claims that the exception applies to this case because Schuss introduced his mental condition by pleading "psychological vulnerability" and a "substantial [in]ability to control himself" as a special defense in the plaintiff's action against Schuss. Although the patient, Schuss, introduced his mental condition in the plaintiff's action against Schuss, and not in the plaintiff's action against the defendant, the plaintiff claims that the actions are one and the same because the action against Schuss is the underlying action to the subrogation action against the defendant. We agree.

The plaintiff's action against the defendant flowed out of the plaintiff's stipulated judgment against Schuss and involved the same facts as the underlying action. Furthermore, under the principles of subrogation, a party that obtains a judgment against an insured defendant is substituted in place of the defendant for the purposes of an action against the insurer on the insurance policy. General Statutes § 38a-321; see 73 Am. Jur. 2d, Subrogation § 1 (1974). The party is "subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment." General Statutes § 38a-321. This principle

of substitution links the action against the insured and the subsequent subrogation action against the insurer to such an extent that they can be regarded as one cause of action. Although they are commenced as separate actions, they combine to form a single "civil proceeding" for the purposes of General Statutes § 52-146f (5).[4]

The defendant, nevertheless, claims that because Schuss' special defense was later withdrawn, Schuss did not introduce his mental condition as an issue in the case. We disagree. A pleading that is later withdrawn or superseded " 'remains in the case as a part of its history and is available to the adverse party as an admission.' " Schenck v. Pelkey, 176 Conn. 245, 248, 405 A.2d 665 (1978). In this case, Schuss' special defense, although later withdrawn, served to introduce his mental condition and constitutes a waiver of the right to prevent the disclosure of his psychiatric records.

Finally, the purpose of the patient-psychiatrist privilege of confidentiality "is to give the patient an incentive to make full disclosure to a physician in order to obtain effective treatment free from the embarrassment and invasion of privacy" that could result from the release of the patient's psychiatric records. State v. White, 169 Conn. 223, 234, 363 A.2d 143, cert. denied 423 U.S. 1025, 96 S. Ct. 469, 46 L. Ed. 2d 399 (1975); see also Bieluch v. Bieluch, 190 Conn. 813, 819, 462 A.2d 1060 (1983). "Communications that bear no rela-

---

[4] The plaintiff also claims that because a judgment creditor is "subrogated to all of the rights" of the insured defendant under General Statutes § 38a-321, the plaintiff as judgment creditor is entitled to Schuss' rights as concern his privilege of confidentiality. The plaintiff claims that it has a right to obtain Schuss' psychiatric records and submit them into evidence because it has all of Schuss' rights under the principles of subrogation. Because we decide in favor of the plaintiff on another basis, we need not determine whether "all of the rights" includes the personal privilege of confidentiality.

tionship to the purpose for which the privilege was enacted do not obtain shelter under the statute and are admissible subject to the normal rules of evidence." *Bieluch* v. *Bieluch,* supra, 819.

The patient may assert the privilege only "if he had a justified expectation that his communications would not be publicly disclosed." *State* v. *White,* supra, 169 Conn. 234; see also Conn. Joint Standing Committee Hearings, Judiciary and Government Functions, Pt. 2, 1961 Sess., p. 853 ("[o]nce the question of a mental illness is introduced by the patient, there is no privilege after that at all for the patient"). In this case, Schuss did not have a justified expectation that his records would not be disclosed because he pleaded mental incapacity as a defense in the underlying action against him. As a result, the purpose of the privilege would not be achieved by allowing Schuss to assert it. Thus, we find pursuant to § 52-146f (5) "that it is more important to the interests of justice" to allow the disclosure of the psychiatric records than to protect the patient-psychiatrist relationship.

## II

The plaintiff claims that the trial court improperly granted the defendant's motion for summary judgment. We agree.

"Pursuant to Practice Book § 384, summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all the material facts . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. Practice Book § 381. In deciding a motion

for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts." (Citations omitted; internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 105–106, 639 A.2d 507 (1994).

Intent refers to an actor's desire to cause the consequences of his act, or to the actor's belief that the consequences are substantially certain to result from it. Id., 108; *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 101, 491 A.2d 368 (1985). "Intent is clearly a question of fact that is ordinarily inferred from one's conduct or acts under the circumstances of the particular case. . . . Thus, whether the actor knows that the consequences of his or her conduct are certain or substantially certain to result from his or her act and still proceeds with the conduct, so that he or she should be treated by the law as though he or she in fact desired to produce the result, is a question of fact for the jury. . . . It is for the finder of fact, not the court on summary judgment, to determine what inferences to draw. . . . [S]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of . . . intent . . . ." (Citations omitted; internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, supra, 229 Conn. 111. Nevertheless, "even with respect to questions of . . . intent . . . the party opposing summary judgment must present a factual predicate for his argument in order to raise a genuine issue of fact." *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 250, 618 A.2d 506 (1992).

In this case, the only proof accepted by the trial court at the time of the motion for summary judgment showed that Schuss intended and expected to cause damage to the synagogue. Schuss' statements in his deposition of December 18, 1990, established that when

he started the fire he expected and hoped to burn down the structure. As a result, the trial court concluded as a matter of law that the intentional act exclusion clause of the policy applied to deny coverage for Schuss' conduct.[5]

The trial court, however, did not consider whether the mental condition of Schuss affected the application of the policy's intentional act exclusion clause. Connecticut has not yet considered this question, but other jurisdictions have determined that the conduct of an insured is not intentional for the purposes of an intentional act exclusion clause where the insured lacks a certain mental capacity. See, e.g., *Globe American Casualty Co. v. Lyons,* 131 Ariz. 337, 339, 641 P.2d 251 (App. 1982); *Congregation of Rodef Sholom* v. *American Motorists Ins. Co.,* 91 Cal. App. 3d 690, 693–94, 154 Cal. Rptr. 348 (1979); *Rajspic* v. *Nationwide Mutual Ins. Co.,* 110 Idaho 729, 731–33, 718 P.2d 1167 (1986); *Shelter Mutual Ins. Co.* v. *Williams,* 248 Kan. 17, 22–24, 804 P.2d 1374 (1991); *Transamerica Ins. Corp.* v. *Boughton,* 177 Mich. App. 253, 255–56, 440 N.W.2d 922 (1989); *State Farm Fire & Casualty Co.* v. *Wicka,* 474 N.W.2d 324, 327–31 (Minn. 1991); *Ruvolo* v. *American Casualty Co.,* 39 N.J. 490, 494–95, 189 A.2d 204 (1963); see generally annot., Liability Insurance: Intoxication or Other Mental Incapacity Avoiding Application of Clause in Liability Policy Specifically Exempting Coverage of Injury or Damage Caused Intentionally by or at Direction of Insured, 33 A.L.R.4th 983 (1984). Because this is an issue of first impression in Connecticut,[6] we will now consider the relationship between mental capacity and intent for the purposes of insurance coverage.

---

[5] The trial court did not rely on the fact that the defendant pleaded guilty to a violation of General Statutes § 53a-113 (a), which has an element of intentionally starting a fire.

[6] This issue was considered in *Rosa* v. *Liberty Mutual Ins. Co.,* 243 F. Sup. 407 (D. Conn. 1965). In *Rosa,* the plaintiff sought to recover from the

In Connecticut, "insane" persons are, in appropriate circumstances, civilly liable for their intentional torts. *Polmatier* v. *Russ,* 206 Conn. 229, 236, 537 A.2d 468 (1988). This principle is based on several factors. For one, there is a strong public interest in compensating victims for their injuries. Id., 235. The law also dictates that when one of two innocent persons must suffer a loss, the person causing the injury should bear it. Id., 235–36. Finally, such a rule encourages those interested in an insane person's estate to restrain him from inflicting injuries on others, and discourages sane tortfeasors from claiming insanity as a defense to their wrongful conduct. Id., 235–36.

The rule that mentally infirm persons face civil liability for intentional torts does not, however, preclude a holding that the actions of such persons are regarded as unintentional for the purposes of an intentional action exclusion clause of an insurance policy because the principles have different justifications.[7] Intentional act exclusion clauses were adopted primarily to prevent individuals from benefiting financially when they deliberately injured others. *Globe American Casualty Co.* v. *Lyons,* supra, 131 Ariz. 339; *Rajspic* v. *Nationwide Mutual Ins. Co.,* supra, 110 Idaho 73; *Shelter Mutual Ins. Co.* v. *Williams,* supra, 248 Kan. 23. An individual who lacks the capacity to conform his behavior to

defendant insurer after entry of a default judgment against the defendant's insured for an intentional tort committed by the insured against the plaintiff. The insurance policy issued by the defendant to the insured contained an intentional act exclusion clause. The court found that the insured suffered from a mental illness that deprived him of the ability to control his actions, to understand the nature of his conduct, and to resist the impulse to act. As a result, the court concluded that the insured's actions could not be regarded as intentional within the meaning of the insurance policy.

[7] Several jurisdictions have recognized distinctions between placing liability on an insane person for intentional torts and interpreting intentional act exclusion clauses of insurance policies. See, e.g., *Rajspic* v. *Nationwide Mutual Ins. Co.,* supra, 110 Idaho 731; *Shelter Mutual Ins. Co.* v. *Williams,* supra, 248 Kan. 22–23.

acceptable standards of society will not, however, be deterred by the existence or nonexistence of insurance coverage for injuries caused by his actions. *Globe American Casualty Co.* v. *Lyons,* supra, 340; *Rajspic* v. *Nationwide Mutual Ins. Co.,* supra, 731; *Shelter Mutual Ins. Co.* v. *Williams,* supra, 23. Therefore, the consideration of mental capacity when interpreting an exclusionary clause is not inconsistent with the purposes of such an exclusion. Furthermore, both principles meet the public interest in compensating victims for their injuries. Under a rule whereby damages caused by an insured's conduct are not denied coverage where the insured lacks a certain capacity, the injured person will have a redress for its damages even if the insured is judgment proof.

Several tests for determining whether the insured's mental incapacity bars the application of an exclusionary clause have been enumerated. Under one test, an insured's actions are not considered intentional where a derangement of the insured's intellect deprived him of the capacity to control his actions in accordance with reason, and, while suffering from that condition, he acted on an irrational impulse. See, e.g., *Globe American Casualty Co.* v. *Lyons,* supra, 131 Ariz. 339; *Congregation of Rodef Sholom* v. *American Motorists Ins. Co.,* supra, 91 Cal. App. 3d 694; *Ruvolo* v. *American Casualty Co.,* supra, 39 N.J. 495. Under another test, an insured's actions are considered intentional where, although he cannot appreciate the wrongfulness of his conduct, he understands the nature and consequences of his actions and intends to cause injury. See, e.g., *Shelter Mutual Ins. Co.* v. *Williams,* supra, 248 Kan. 24; *Transamerica Ins. Corp.* v. *Boughton,* supra, 177 Mich. 255–56. Under a third test, an insured's actions are not considered intentional where, because of mental illness or defect, the insured does not appreciate the wrongfulness of his conduct, or is deprived of the

capacity to control his actions regardless of his understanding of the wrongfulness of his action. See, e.g., *State Farm Fire & Casualty Co.* v. *Wicka,* supra, 474 N.W.2d 331.

We conclude that the mental condition of an insured may affect the application of a policy's intentional act exclusion clause. The ruling is consistent with our Supreme Court's holding in *Polmatier,* as it furthers the strong public interest in compensating victims for their injuries. We also conclude that, regardless of the test we adopt for determining intentional conduct for the purposes of an exclusionary clause, the trial court improperly granted summary judgment in this case. Here, Schuss placed his mental condition in issue by pleading mental incapacity as a special defense. Because his mental condition might affect the application of the policy exclusion, there is a genuine issue of material fact as to whether Schuss intended or expected to cause damage to the synagogue. This issue should have been resolved by the trier of fact, not the court on summary judgment, and the case must be remanded for trial.

At trial, the trier of fact must determine whether Schuss' actions were intentional for the purposes of the intentional act exclusion clause.[8] In making this determination, the trier of fact will consider Schuss' psychiatric records. This determination is also to be made by considering whether, because of mental illness or defect, the insured did not understand the nature or wrongfulness of his conduct, or was deprived of the capacity to control his actions regardless of his under-

---

[8] We note that while the construction of an unambiguous insurance contract is a question of law for the court; *Aetna Life & Casualty Co.* v. *Bulaong,* 218 Conn. 51, 558 A.2d 138 (1991); the determination of the insured's intent as to the manner in which the insured behaved for the purposes of the insurance contract is a question of fact. See *Suarez* v. *Dickmont Plastics Corp.,* supra, 229 Conn. 111.

standing of the nature or wrongfulness of his action. See *State Farm Fire & Casualty Co.* v. *Wicka,* supra, 474 N.W.2d 331. We adopt this test because it addresses both the cognitive and volitional capacities of an insured.[9] Id.

The judgment is reversed and the case is remanded for further proceedings.

In this opinion the other judges concurred.

---

[9] This test is also consistent with our test for mental incapacity in the criminal context. See General Statutes § 53a-13 (a).